# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO

JANE DOE,

Plaintiff,

-against-

OHIO UNIVERSITY, OHIO UNIVERSITY
BOARD OF TRUSTEES, TAYLOR J. TACKETT,
T. DANE BENNETT, and JASON PINA,

Defendants.

Civil Action No: 2:21-cv-858

Judge Edmund Sargus, Jr.

Magistrate Judge Elizabeth Deavers

---

## PLAINTIFF JANE DOE'S AMENDED COMPLAINT WITH JURY DEMAND

**PLAINTIFF JANE DOE**[1] (hereinafter referred to as "Plaintiff"), by her attorneys, The Baker Law Group, P.C. and Nesenoff & Miltenberg, LLP, as and for her Amended Complaint against Defendants Ohio University and the Ohio University Board of Trustees (hereinafter collectively "Defendant OU" or the "University"), Taylor J. Tackett ("Tackett"), T. Dane Bennett ("Bennett"), and Jason Pina ("Pina") (sometimes collectively "Defendants") respectfully alleges as follows:

## THE NATURE OF THE ACTION

1.     Plaintiff, a graduate of the University, brings this action for damages against Defendant OU for violations of Title IX of the Educational Amendments of 1972, 20 U.S.C. §1681,

---

[1] Plaintiff previously filed a motion to proceed under the pseudonym "Jane Doe" which was granted by the Court on April 23, 2021, *See* Dkt. No. 19.

*et seq.* ("Title IX") stemming from the University's gross mishandling and willful disregard of Plaintiff's report of sexual assault, resulting in Plaintiff's subjection to a hostile educational environment, harassment, and retaliation by her rapist and the students at Defendant OU who continued to support him. Plaintiff further brings this action against all Defendants for violations of the Equal Protection Clause and Due Process Clause of the Fourteenth Amendment to the United States Constitution pursuant to 42 U.S.C. § 1983 stemming from Defendants' failure to provide Plaintiff a proper opportunity to be heard and treating Plaintiff less well than her male attacker, Smith.

2.     Specifically, while attending the University in the Winter of 2019, Plaintiff was at a house party with friends from Defendant OU. While at the party, Plaintiff became noticeably intoxicated to the point of incapacitation; Plaintiff was vomiting in the bathroom, was unable to talk, could not walk without assistance, and blacked out unconscious in various places in the house. While Plaintiff was in this most vulnerable state, a fellow University student, "John Smith" ("Smith")[2] took full advantage of Plaintiff and viciously raped her after many of the partygoers had left.

3.     After Plaintiff reported the rape to both the police and the University, she was met with unmitigated harassment and retaliation from Smith and his friends, many of which were in classes with Plaintiff at the University. When the harassment was reported to the University, Defendant OU condoned, authorized, and joined in the further victimization of Plaintiff by, among other things, refusing to properly investigate Plaintiff's ongoing persecution from the University's students and forcing Plaintiff to bear the brunt of the consequences which should have been meted

---

[2] Plaintiff herein refers to her assailant by the pseudonym, John Smith.

out to her harassers. Defendant OU's abhorrent refusal to investigate the ongoing harassment was not only a violation of its own Title IX policies and procedures, it also violated federal Title IX guidance, which dictated that universities "must" respond to incidents that create a hostile environment.

4.     The emotional toll of Plaintiff's assault, compounded with the daily torment the University allowed to happen to Plaintiff, decimated Plaintiff's well-being; during the day, Plaintiff found herself becoming more and more frightened to leave her apartment for fear of facing further beratement by students, while at night she often awoke screaming herself out of a nightmare.

5.     The only semblance of solace Plaintiff was able to find was the University's decision to find Smith responsible for Plaintiff's assault. However, this relief was short-lived as the University's administration quickly worked to overturn its own hearing panel's decision. Breaking its own rules and guidelines, and ignoring notification from authorities that there was sufficient evidence against Smith to convict him of rape in criminal court under a higher burden of proof, the University inappropriately ordered a re-hearing of Plaintiff's complaint and, using the same evidence once relied upon to find Smith responsible for Plaintiff's rape, cleared Smith of any wrong-doing. Making matters worse, when Plaintiff attempted to appeal the inappropriate and unjust reversal of the hearing panel's initial determination, Defendant OU ignored Plaintiff's rights under its own policies and rejected Plaintiff's attempts at appeal.

6.     The harassment Plaintiff experienced after she made her initial report of sexual assault to the University paled in comparison to what she experienced after the University exonerated Smith of any wrongdoing. Following the decision finding Smith not responsible for

Plaintiff's rape, Smith openly ignored mandates to stay away from Plaintiff as his friends openly called Plaintiff a liar and accused her of being a racist[3].

7.      Not only did the University ignore complaints from Plaintiff about Smith's and his friends' continued behavior, Defendant OU also ignored notice from the District Attorney's office that Smith was ordered by the criminal court judge to stay away from Plaintiff and had been failing to do so on campus. Instead, Defendant OU turned a blind eye to Plaintiff's pain and the torment she endured right under the University's nose.

8.      As a result of Defendants' willful and wanton actions and/or inactions, Plaintiff has suffered tremendous emotional damages which manifested in a myriad of ways and greatly threatened Plaintiff's physical health and well-being. In addition, Plaintiff has suffered further damages which include, but are not limited to, the loss of educational and career opportunities, and other direct and consequential damages.

## **THE PARTIES**

9.      Plaintiff is a natural person and a resident of the state of Illinois.

10.      Ohio University was at all relevant times, and continues to be, a public university organized and existing under the laws of the State of Ohio.

11.      The Ohio University Board of Trustees is comprised of more than ten (10) persons, appointed by the Governor of Ohio, with the advice and consent of the Ohio Senate, who have the general obligations to protect the interests of Ohio University, and the rights, safety, and welfare of its students, including, but not limited to, the students' rights to be free from sexually abusive behavior by fellow students, as prohibited by Title IX.

---

[3] Upon information and belief, Smith is African American.

12.     The Board of Trustees is being named as a defendant in this action to the extent that it is the proper party notwithstanding, and/or is the real party in interest to defend this action against the University. Furthermore, the Board of Trustees is the governing body of the University and is charged by law with the authority and duty to determine policies and to make or approve rules and regulations to promote the mission of the University. This legally imposed duty includes the authority to delegate administrative responsibilities to supervise and control the conduct of any member or segment of the University community who impedes, obstructs, or seriously threatens the mission of the University, including the rights, safety, and welfare of its students.

13.     The University receives, and at all relevant times received, federal financial assistance.

14.     According to published financial statements for the University, Defendant OU received approximately $17,300,000.00 in federal government grants and contracts in fiscal year 2019, approximately $18,400,000.00 in federal government grants and contracts in fiscal year 2020, and has budgeted to receive approximately $21,100,000.00 in federal government grants and contracts in fiscal year 2021. *See* Ohio University 2021 Budget Book, available at https://www.ohio.edu/sites/default/files/sites/finance/budget/files/FY21%20Budget%20Book%20Final%20Upload.pdf.

15.     Accordingly, the University is subject to liability under Title IX.

16.     Defendant Taylor J. Tackett is a natural person, and at all relevant times herein, was, and continues to be, Defendant OU's Assistant Dean of Students and Director of Community Standards and Student Responsibility. Upon information and belief, Tackett is a resident of Ohio.

17.     Defendant T. Dane Bennett is a natural person, and at all relevant times herein, was, and continues to be, Defendant OU's Assistant Director of Community Standards and Student Responsibility. Upon information and belief, Bennett is a resident of Ohio.

18.     Defendant Jason Pina is a natural person, and at all relevant times herein, was Defendant OU's Vice President for Student Affairs. Upon information and belief, Pina is a resident of New York.

## JURISDICTION AND VENUE

19.     This Court has federal question and diversity jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1332 because: (i) the claims arise under the statutes and/or Constitution of the United States and (ii) Plaintiff and Defendants are citizens of different states and the amount in controversy exceeds $75,000.

20.      Venue for this action properly lies in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to this action occurred in this judicial district.

## FACTUAL ALLEGATIONS

### Defendant OU's History of Fostering and Condoning "Rape Culture" on Campus

21.     Defendant OU has been widely criticized, locally and nationally, for its failure to adequately respond to allegations of sexual assault. Unfortunately, Defendant OU has failed to take the necessary steps to remedy its shortcomings.

22.     Since 2014, students have been rallying in an attempt to get Defendant OU to take action against the rape culture on campus. For example, students gathered in 2014 for a "f*ck rape culture" rally to protest rape culture on Defendant OU's campus. *See* Anthony Eliopoulos, *Ohio*

*University: F\*ck Rape Culture,* The New Political (Oct. 24, 2014), available at https://www.youtube.com/watch?v=y7ExvSwJiXs.

23.    By way of further example, over 1,000 students signed a petition to ban the ACACIA fraternity chapter at Defendant OU due to the fact that there had been a "flood" of complaints that its fraternity members had drugged and raped women. *See Ban ACACIA Chapter at Ohio University,* change.org (2014), available at https://www.change.org/p/community-members-against-sexual-violence-ban-acacia-chapter-at-ohio-university.

24.    The petition noted that there had been a saying on campus of "ACACIA will rape ya" for *years*, yet Defendant OU never stepped in to remedy the matter. Students called for Defendant OU to take allegations of sexual violence seriously. *Id.*

25.    While the University alleged that its investigation into the matter uncovered no evidence of wrongdoing, ACACIA put on display its endorsement of rape culture yet again in another instance in 2015, when members stood outside a sorority house singing a sexually explicit parody of the Beatles song "Hey Jude," replacing the lyrics with "send nudes, don't let me down, take my soft dick and make it harder." *See* Laura Donovan, *Ohio Fraternity Is Under Fire for This Incredibly Sexist Song,* Attn.com (Nov. 3, 2015), available at https://archive.attn.com/stories/3983/ohio-fraternity-sings-sexist-song.

26.    Nevertheless, despite the members' harassment of females coupled with numerous allegations of sexual misconduct, the University subsequently found that "the incident did not rise to a level of violating the university's sexual misconduct policy, and no hazing was found." *See* Sheridan Hendrix, *Ohio University orders second fraternity to suspend activities,* The Columbus

Dispatch (Oct. 1, 2019), available at https://www.dispatch.com/news/20191001/ohio-university-orders-second-fraternity-to-suspend-activities.

27.     However, the fraternity's rape issue is so widely known that a student organization, the Ohio University Student Union, passed out pamphlets to freshman students on campus with the warning: "DO NOT GO TO THE 'BLUE HOUSE', THE ACACIA FRATERNITY HOUSE LOCATED ACROSS FROM THE BP ON COURT ST. THEY ARE NOTORIOUS FOR DRUGGING THEIR FREE DRINKS AND RAPING GIRLS." *See* Debbie Encalada, *Ohio University Students Make Pamphlets Warning Others About Frat That Allegedly "Drugs" and "Rapes" Girls,* Complex (Aug. 28, 2015), available at https://www.complex.com/pop-culture/2015/08/ohio-university-student-group-warns-students-about-allegedly-rapey-frat.

28.     ACACIA was once again investigated four years later in 2019, and even then, the University declined to acknowledge the fraternity's longstanding history of sexual assault. Rather, the University issued a cease-and-desist letter to the fraternity when it discovered one member's academic journal entry which stated that he was required to clean houses as part of a hazing process. *See* Greg Piper, *Ohio University suspends fraternity because it made pledges… clean houses*, The College Fix (Oct. 25, 2019), available at https://www.thecollegefix.com/ohio-university-suspended-fraternity-because-it-made-pledges-clean-houses/. Clearly, Defendant OU took cleaning houses more seriously than allegations of sexual assault.

29.     Upon information and belief, ACACIA is still operating as a campus recognized fraternity to this date, and the University has failed to take any steps to address the fraternity's sexual assault issue.

30.     Unfortunately, the issue of sexual assault at Defendant OU has not been limited to the fraternity scene, but is also a campus-wide issue.

31.     In 2017, hundreds gathered to protest Defendant OU's handling of a university professor who was found guilty of sexually assaulting multiple female students. The University received at least six different complaints about the professor dating back *as early as 2003*, yet the University did not open up an investigation until 2016. *See* Ryan Powers, *Why Isn't OU Taking Action?,* SocialistWorker.org (Mar. 1, 2017), available at https://socialistworker.org/2017/03/01/why-isnt-ou-taking-action.

32.     Incredibly, despite the fact that the professor was found guilty of sexual misconduct following an eight-month long internal investigation, he was only placed on a temporary administrative leave, remained as an employee of Defendant OU, and was *promoted* while on leave. *Id.*

33.     The issue of sexual assault on campus continued to increase, as from the very beginning of the Fall 2018 semester, reports of rape escalated at an alarming rate. Numerous students tweeted about the rape problem on campus with one tweet reporting that there had been four reported rapes in the first week and a half of the semester[4]. The tweet went viral, gaining over 37,000 retweets and 147,000 likes.

34.     These reported rapes occurred during Defendant OU's welcome week, where numerous off-campus student organizations hung banners displaying repulsive, sexually-explicit language.

---

[4] https://twitter.com/torihelmke/status/1037504778572648448

35.     The University itself even admitted that this was not a new problem, as the campus-wide University statement acknowledged that multiple faculty members were "appalled that these signs <u>continue to appear year after year</u>." *See Ensuring a safe, warm and welcoming environment at Ohio University,* Ohio University News (Aug. 28, 2018) (emphasis added). Nevertheless, the University took no measures beyond mere words to alter the campus culture.

36.     In light of the repugnant signs, students at Defendant OU opened an exhibit in the University's Baker Center which displayed the clothes survivors were wearing when they were assaulted. The exhibit was put together to protest Defendant OU's rape culture and victim blaming that happened all too often. *See* Heather Willard, *Exhibit sparks conversation on rape culture in Athens,* Athens Messenger (Sept. 9, 2018), available at https://www.athensmessenger.com/spotlight/exhibit-sparks-conversation-on-rape-culture-in-athens/article_10fb2715-ba7a-5053-bf0a-e5423fd1919b.html.

37.     Reports continued to rise, with over twelve sexual assaults reported between the beginning of the semester in late August to the end of September. Students gathered to march in protest of the campus rape culture. *See* Danielle Silva, *Ohio University students rally against sexual assault admis spate of rape reports,* NBC News (Sept. 29, 2018), available at https://www.nbcnews.com/news/us-news/ohio-university-students-rally-against-sexual-assault-amid-spate-rape-n913551.

38.     In the Fall 2018 semester alone, the Defendant OU police department received 28 reports of rape, nearly matching in one semester the total instances of sexual misconduct reported for all of 2017. *See* Terry Smith, *2018's Top Dozen Local Stories (part 2),* The Athens News (Jan.

2, 2019), available at https://www.athensnews.com/news/local/s-top-dozen-local-stories-part/article_fb62d0b0-0eb8-11e9-8189-8fae5eca67f0.html.

39.    In response to the numerous reported rapes, media sources cited Defendant OU's "lackadaisical response to sexual violence on campus," and students called for "more serious action" to be taken when such reports are raised to the campus police. *See* Ryan Powers and Max Hannum, *An Epidemic of Sexual Assault at Ohio University,* SocialistWorker.org (Oct. 1, 2018), available at https://socialistworker.org/2018/10/01/an-epidemic-of-sexual-assault-at-ohio-university.

40.    Despite the University's claims that it was committed to addressing complaints of sexual misconduct, Defendant OU failed to provide adequate training to its employees. In January of 2019, a female student filed a lawsuit against Defendant OU claiming that mandatory reporters at the University were not trained to report her complaints of sexual harassment by a University professor to the Title IX office, thereby letting the harassment continue. Defendant OU's failure to train its employees resulted in a $90,000 settlement. *See* Ben Peters, *Settlement reached in OU sexual harassment suit (Jun. 9, 2020).*

41.    Unfortunately, this case represents more of the same – Defendant OU's inadequate and lackadaisical response to allegations of sexual assault. Although the University may claim in statements to take complaints of sexual misconduct seriously, the University has proven that its words mean little to nothing as it has failed to take action to actually change Defendant OU's campus rape culture.

**Plaintiff is Sexually Assaulted by a Fellow Student**

42.     February 23, 2019 started out as a fairly normal day for Plaintiff. She was taking 20 credit-hours for the Spring of 2019, so she was incredibly focused on her schoolwork. In the morning, she met with a group to work on a project.

43.     Once the meeting was over, Plaintiff went to a bar with a friend of hers, "Witness A", and drank one champagne slushie.

44.     Later that evening, Plaintiff and Witness A went to a party located at an off-campus house where Smith lived with a number of his fraternity brothers and friends. Plaintiff knew the students that lived in the house because at one point prior, she had plans to live there herself. She had no prior romantic relationship with any of the occupants of the house, but rather, she viewed them all as brothers.

45.     When Plaintiff and Witness A arrived at the party, there were about 50 to 100 people present. Plaintiff stayed with Witness A and drank two small Styrofoam cups of Jungle Juice[5].

46.     Once the house ran out of Jungle Juice, Plaintiff briefly left the party with Witness A and purchased an oversized bottle of wine from a local liquor store.

47.     When she returned to the party, Plaintiff began drinking the wine and offered to share the wine with others.

48.     Plaintiff continued to socialize with her friends at the party and continued to drink heavily from the wine bottle she had purchased. Plaintiff recalls watching her friends play the drinking game "Beer Die."

---

[5] Jungle Juice is a mix of everclear, vodka, or other liquor with Kool Aid or juice.

49.     At some point, Plaintiff blacked out in a Coleman-style folding chair.

50.     Upon information and belief, Plaintiff was far more intoxicated than she realized and was losing control of her own motor and cognitive functions.

51.     Some time later, when Plaintiff awoke and attempted to get up from the chair, she immediately fell down. Plaintiff was unable to navigate the room on her own and had no control of her surroundings.

52.     Witness A then helped Plaintiff into the bathroom, where Plaintiff became violently sick and began to throw up. While in the bathroom, Plaintiff hit her head on the sink and then fell asleep while vomiting in the bathroom.

53.     At one point, another friend, "Witness D" came into the bathroom to help Plaintiff up, as she was at that point completely unable to move on her own. Witness A and Witness D had to physically pick Plaintiff up off the ground and help her walk to the couch; Plaintiff was completely incapacitated.

54.     Plaintiff was not having coherent thoughts, but merely remembers being confused. She had her phone with her but was unable to text people. She was also unable to hold a conversation with Witness A. Plaintiff then blacked out unconscious on the couch.

55.     While Plaintiff was on the couch, there were numerous photos taken of her by the party attendees. Smith published two Snapchat posts poking fun at the fact that Plaintiff was passed out on the couch.

56.     Witness A waited at the party with Plaintiff until approximately 4:00 a.m. At that point, Plaintiff was still blacked out from her alcohol consumption.

57.     The next Plaintiff can recall, she woke up in a dark room, unaware of where she was. She was leaned up against an armrest, and Smith was aggressively kissing her. Plaintiff was still unable to talk or move, and she could not get him to stop.

58.     While Smith was kissing her, Plaintiff felt her phone vibrate against her leg but she was helpless to answer or reach for it. It happened to be a text message from Witness A saying, "You drank too much. Sorry I had to leave you." Plaintiff was alone with Smith and had no ability to stop his advances or cry out for help.

59.     From this point forward, Plaintiff went in and out of consciousness.

60.     The next thing Plaintiff remembered is being in Smith's bed. Plaintiff had no knowledge of how she got into his bedroom. At that point, Plaintiff was still unable to move, and she was completely naked. She did not know where her clothes were or how they got removed.

61.     Smith then performed oral sex on Plaintiff. After he stopped, Smith used his hands to hold down Plaintiff's wrists and immediately began having sexual intercourse with Plaintiff without her consent.

62.     Plaintiff, already unable to move on her own, let alone while being held down, could not get Smith off of her. Plaintiff repeatedly attempted to say that she needed to go home, but found she was still unable to speak.

63.     While Smith took sexual advantage of Plaintiff, he slapped Plaintiff's face, spit in her eyes, and told Plaintiff to call him "Daddy."

64.     Plaintiff eventually was able to utter to Smith that she needed to go home, but Smith ignored her and, in fact, fell asleep on top of her while still penetrating her.

65.     Plaintiff began to gain back the ability to move and attempted to wiggle out from underneath Smith, but she was trapped beneath her assaulter, a man much larger and stronger than her.

66.     In fear, Plaintiff had no choice but to wait until Smith woke up. When he did awaken, Plaintiff, still barely able to talk or move, stated that she needed to go home.

67.     However, Smith again dismissed her, said "sorry," and continued to have intercourse with Plaintiff without her consent. Smith then ejaculated inside of Plaintiff without a condom.

68.     After Smith got off of her, Plaintiff gathered whatever strength she could find, looked around, grabbed the first clothes she could locate, and scrambled to leave; all she could focus on was getting away from Smith.

**Plaintiff Reports the Assault to Numerous Outcry Witnesses**
**Before Formally Reporting the Assault to Police and the University**

69.     After Plaintiff left, she went to Witness A's house because it was on the way back to her house, but the door was locked. Plaintiff then hurried to her home, walking about 30 minutes alone to get back to her house.

70.     It was as if Plaintiff was in a blur; Plaintiff's mind raced to comprehend what had happened to her.

71.     Once Plaintiff got back to her house, she called a number of her friends in an attempt to talk about her traumatic experience.

72.     At approximately 6:30 a.m., "Witness C" answered the phone and Plaintiff told her what happened. Witness C told Plaintiff that she needed to go to the hospital and report what happened.

73.    Plaintiff spoke to Witness C, Witness D, Witness A, her parents, and another friend, "Witness E", about the incident in the early morning hours following the Assault.

74.    Despite all of her friends and family advising her that she should go to the hospital, it was not until a mutual friend of Plaintiff and Smith advised that he was aware that Smith had similarly attacked other women that Plaintiff found the strength to formally report her Assault. Plaintiff did not want to stay silent for fear that Smith would get away with what he had done and victimize another person.

75.    On or about February 24, 2019, Witness C and Witness D picked up Plaintiff and took her to the hospital where a rape examination was performed.

76.    A few days after the Assault, Plaintiff reported the incident to Defendant OU's Title IX office.

77.    Specifically, on February 27, 2019, Plaintiff submitted a Sexual Misconduct, Relationship Violence, and Stalking Incident Report to Defendant OU (the "Complaint").

78.    Upon information and belief, Plaintiff's Complaint was forwarded to the University's Office of University Equity and Civil Rights Compliance (the "ECRC Office").

79.    The Complaint gave a short but detailed summary of Plaintiff's recollection of the Assault and named Smith as her attacker.

80.    Plaintiff also made a formal criminal complaint with the local police department.

81.    Following her criminal and internal school reports, Plaintiff was contacted by the University to discuss her Complaint and to schedule a time to come in for a further interview.

82.     Upon information and belief, in light of the simultaneous complaints submitted by

Plaintiff to the police and the University, the police and District Attorney's office made it a point

to keep the University updated on its investigation and to share information with Defendant OU.

**Relevant Portions of Defendant OU's Internal Policies**

83.     In February of 2019, Defendant OU maintained a sexual misconduct policy,

codified in University Policy 03.004 (the "Policy").

84.     Upon information and belief, Plaintiff's Complaint implicated two potential Policy

violations for non-consensual sexual contact and non-consensual sexual intercourse.

85.     The Policy defined Non-Consensual Sexual Contact as,

> vaginal or anal penetration by any body or foreign object [or] oral
> copulation (mouth to genital contact or genital to mouth contact),
> however slight by a person upon a person without consent.

86.     The Policy defined Non-Consensual Sexual Intercourse as,

> intentional contact with the breasts, buttocks, groin, or genitals,
> [including] touching another with any of these body parts, or making
> another touch you or themselves with any of these body parts, [or]
> any intentional bodily contact in a sexual manner by a person upon
> a person without consent.

87.     With respect to consent, the Policy provided,

> Consent must be informed, knowing, and voluntary. Consent must
> be clear and unambiguous for each participant throughout any
> sexual encounter. Consent to some sexual acts does not imply
> consent to others, nor does past consent to a given act imply ongoing
> or future consent. Consent can be revoked at any time. For all of
> these reasons, sexual partners must evaluate consent in an ongoing
> fashion and should communicate clearly with each other throughout
> any sexual encounter.
>
> Consent cannot be obtained from someone who is asleep or
> otherwise mentally or physically incapacitated, whether due to
> alcohol, drugs, or some other condition. Consent cannot be obtained

by threat, coercion, or force. Agreement given under such conditions does not constitute consent. In order to give effective consent, one must be of legal age.

88.     Defendant OU also maintained a Student Sexual Misconduct, Relationship Violence, and Stalking Process (the "Process Document"), which was meant to be used to "adjudicate alleged student violations of [Defendant OU's] sexual misconduct policy…"

89.     The Process Document described the process for investigation and adjudicating reports of sexual misconduct, including sexual assault, involving student respondents.

90.     Accordingly, the Process Document applied to Plaintiff's Complaint.

91.     Pursuant to the Process Document, once the ERCR Office received a report of sexual misconduct, the office was required to conduct a preliminary assessment to determine if a formal investigation was warranted.

92.     In addition, the ERCR Office determined if any interim measures were appropriate.

93.     Pursuant to the Process Document, interim measures were available even if a formal investigation was not warranted and could include:

- Administrative directives for no contact;
- Temporary or permanent re-assignment of housing;
- Restriction of access to particular areas of campus;
- Altered academic arrangements (moving an individual from class, completing work online, etc.);
- Designated "safe hours" of use for communal spaces on campus [ ]; and, in some instances
- Interim suspension of the respondent

94.     If a formal investigation was deemed warranted, there would be two investigators assigned from the University's "investigator pool", who were charged with conducting "a prompt, thorough, and impartial investigation."

95.     With respect to the investigation, the Process Document provided, in relevant part:

Investigation will consist of interviews with the complainant, respondent, and relevant witnesses. Witness names may be supplied by either or both the complainant and respondent. [ ] Additionally, the investigative team may determine through other means that they need to speak with someone and seek that person out independently. Witness interviews will be limited in scope to the relevant facts of the matter. Character witnesses and witnesses without relevant information will not be interviewed.

At times, investigations may uncover additional information that warrants the removal or addition of charges against the respondent…

At the conclusion of the investigation, the investigative team will write an investigative report. The investigative report will include the following:

- The names of the investigative team;
- Applicable policies to the matter;
- A list of involved parties;
- A brief history of the investigation;
- Overview of allegations;
- The violations that were alleged to have occurred;
- Summaries of the interviews the investigative team conducted; [and]
- Other information as deemed relevant by the investigators.

96.     With respect to timing, the Process Document provided only that "every effort will be made to investigate and resolve allegations as quickly as possible." The Process Document further advised that there may be delays in the process and, if that were to occur, the parties to the investigation would be notified.

97.     Pursuant to Process each party was entitled to an opportunity to review the investigative report with the investigators and the information and materials considered by the investigators as part of the investigation.

98.     Pursuant to the Process Document, the next step in the process was a hearing.

99.     Specifically, the Process Document provided, in relevant part:

A hearing will be conducted for all matters that are not resolved by the respondent accepting responsibility after the pre-hearing meeting. [ ]. The hearing authority will use the preponderance of the evidence standard in making their decision as to whether or not university policy was violated. Both members of the hearing authority must agree that the standard of proof has been met. If the members of the hearing authority disagree, there will be no finding of violation.

All hearings under this process will be closed to the public. At designated times during the hearing, the complainant and respondent, or their advisors, may ask relevant questions directly of each other and witnesses. The hearing authority will determine if questions are relevant. [ ]. If the hearing authority determines that a question is not relevant, the party asking the question may choose to reword the question or provide supporting information as to the relevance of the question for further consideration by the hearing authority. The hearing authority also reserves the right to disallow or require the parties to reword questions that have already been asked and answered. In addition, it is expected that all parties will ask and answer questions in a manner that maintains civility throughout the proceeding.

…

The following is a guide as to how the hearing will be conducted:

- The hearing authority will begin the hearing by discussing expectations for the hearing.
- The hearing authority will give a brief overview of the nature of the allegations.
- The hearing authority may ask the investigative team clarifying questions regarding the investigation at any point during the hearing.
- The complainant will be given an opportunity to respond to the investigative report.
- The hearing authority will have an opportunity to ask complainant questions.

- The respondent, or their advisor, will be given the opportunity to ask relevant questions of the complainant as described above.
- The respondent will be given an opportunity to respond to the investigative report.
- The hearing authority will have an opportunity to ask respondent questions.
- The complainant, or their advisor, will be given the opportunity to ask relevant questions of the respondent as described above.
- The hearing authority will call witnesses and ask them questions.
- The complainant, or their advisor, will be given the opportunity to ask relevant questions of witnesses as described above.
- The respondent, or their advisor, will be given the opportunity to ask relevant questions of the witnesses as described above.
- The complainant will be given the opportunity to make a summary statement, including an impact statement if any, and any requested sanctioning considerations.
- The respondent will be given the opportunity to make a summary statement, including an impact statement if any, and any requested sanctioning considerations.

…

At the end of the hearing, the hearing panel will go into closed session to deliberate on findings and, if applicable, sanctions.

…

Both parties will receive a formal written notice of the outcome of the hearing within five business days of the conclusion of the hearing, with a copy to the Title IX Coordinator. The finding of violation or not in violation will be given, along with a rationale for why the decision was made. If there is a finding of violation, the sanction will also be given, along with a rationale as to why that sanction was chosen. Sanctions, if any, will be determined in accordance with the sanctioning guidelines for sexual misconduct maintained by the Office of Community Standards and Student Responsibility.

100. If either interested party to an investigation was dissatisfied with the outcome, the

Process Document provided a limited opportunity to appeal.

101. Specifically, the Process Document provided, in relevant part:

Both the complainant and the respondent will have five business days from the written notification of the decision to appeal. Both parties have the right to appeal on the following grounds:

- Inappropriate sanction (cases of clear abuse of discretion by the hearing authority);
- A procedural defect occurred that significantly impacted the outcome of the hearing; and/or
- Discovery of new and significant information that could have affected the outcome of the hearing and that was not known or could not reasonably have been discovered and/or presented at the time of the hearing.

If either party submits an appeal, that appeal will be shared with the other party who will then have five business days to write a rebuttal. [ ]. The appeals and rebuttals will be submitted to [Defendant OU's Community Standards and Student Responsibility ("CSSR")], who will forward them with the case file, to the vice president for student affairs or designee. [ ]. The vice president or designee may uphold the decision, alter the sanction, order a new hearing, or remand the matter to the original hearing authority as appropriate. The appeal process is not a re-hearing on the matter. It is a closed process and is limited to the review of written documents and the case file.

102. The final step in the process was the issuance of Defendant OU's final

determination.

103. Regarding same, the Process Document provided, in relevant part:

If there is no appeal, the hearing chair will issue a notice of final determination to both the complainant and respondent once the appeal period has passed with a copy to the Title IX coordinator. If there is an appeal, the vice president for student affairs will issue a letter stating the outcome of the appeal. The letter will be sent to both the complainant and respondent with a copy to the Title IX coordinator and the director of CSSR. Unless a new hearing is

granted, the letter from the vice president for student affairs is considered the notice of final determination.

**Defendant OU Initiates an Investigation into Plaintiff's Complaint**

104.    Pursuant to the Process Document, Defendant OU assigned Jessica Cook ("Investigator Cook") and Jacqueline Fausnight ("Investigator Fausnight") (collectively the "Investigators") to investigate Plaintiff's Complaint against Smith.

105.    On or about March 5, 2019, Plaintiff met with the Investigators. The purpose of the March 5th meeting was to introduce Plaintiff to the Investigators and discuss the University's process and procedures with Plaintiff.

106.    At that time, Plaintiff was advised of the process for investigating the Complaint, her right to choose whether or not to be present for a hearing regarding the Complaint, and her right to have an advisor throughout the process.

107.    Pursuant to the Process Document, Plaintiff was entitled to a "Process Advisor" who was a "[m]ember of the university community who has been specifically trained to provide information to complainants or respondents regarding the process."

108.    The University provided Plaintiff with a Process Advisor named "Andrew."

109.    However, after just a short while working with Andrew, it was obvious to Plaintiff that he was very inexperienced, and there was no apparent evidence that Andrew had received any formal training in the Title IX, investigation, or adjudication processes that Plaintiff was expected to participate in following her Complaint.

110.    Also on March 5, 2019, Defendant OU issued a No Contact Directive ("NCD") which barred both direct and indirect contact between Plaintiff and Smith.

111.   Upon information and belief, the NCD was designed to protect Plaintiff while on campus.

112.   As part of their investigation, the Investigators interviewed several witnesses, beginning with Plaintiff.

113.   Curiously, despite the fact that Plaintiff had submitted the Complaint on February 27th, it was not until over a month later that the Investigators spoke with her substantively about the Assault and her Complaint.

114.   Plaintiff was interviewed on April 1, 2019.

115.   During her interview, Plaintiff truthfully and candidly shared the harrowing experience of being assaulted by Smith, including information related to her activities both the day of and days after the Assault.

116.   Following Plaintiff's interview, the Investigators met with and interviewed several witnesses who were believed to have knowledge of the Assault and/or Plaintiff's and Smith's activities on the night of the Assault.

117.   Many of the witnesses interviewed by the Investigators corroborated Plaintiff's allegations and attested to Plaintiff's obvious state of inebriation.

118.   Specifically, when interviewed,

   a.   Witness A told the Investigators that Plaintiff (i) had been drinking some form of alcohol from around 6:00 p.m. onward on the night of the Assault; (ii) had "blacked out" and "face-planted on the floor", (iii) was "like a zombie"; (iv) could not walk properly; (v) was "puking a bunch in the toilet" and banged her head on the toilet and the floor of the bathroom; and (vi) could not properly talk or walk. Witness A further advised that while he could not recall exactly who saw Plaintiff in such a state, it was very open and obvious that Plaintiff was incapacitated from alcohol and that Smith was present when Witness A was with Plaintiff in her incapacitated state.

Witness A further noted that on the night of the Assault, Smith was "the most sober" Witness A had ever seen him.

b. Witness D told the Investigators that (i) Plaintiff's intoxication level progressively worsened throughout the night of the party to the point that Plaintiff was "trashed" and "passed out"; (ii) after Plaintiff was already visibly drunk, she continued to drink a "big, hefty" bottle of wine; (iii) Smith was present in the room when Plaintiff was brought from the bathroom where she was sick and was passed out on couch; (iv) after he smoked marijuana with Smith, Smith was "kinda chill" and not belligerently drunk; and (v) he was surprised Plaintiff would have been able to physically walk on her own given her state of inebriation at the end of the party.

c. Witness F told the Investigators that Plaintiff was throwing up in the bathroom on the night of the party and that Plaintiff indicated she did not know where she was. Witness F estimated that Plaintiff was a "10 on the 10-point intoxication scale" with 10 meaning passed out drunk.

d. "Witness K" told the Investigators that Plaintiff was "nearly falling down", "incoherent", and "was just completely overtaken" on the night of the Assault.

119. Moreover, many of the witnesses submitted evidence demonstrating Plaintiff's state of intoxication, including pictures and videos.

120. In one of the submitted photos, Plaintiff is displayed blacked out and unconscious slumped over a "Coleman" style chair.

121. In yet another photo, Plaintiff is seen drunk and sick on the floor in the bathroom.

122. The video, which was taken by Smith on the night of the Assault, showed, among other things, (i) an image of Plaintiff again blacked out and unconscious laying half on the floor and half on a couch, and (ii) an image of Plaintiff blacked out and unconscious laying under a blanket on the couch with what appeared to be a half full drink in a cup. The images in the video were, upon information and belief, taken roughly three hours apart.

123.    Notably, the Investigators did not interview Smith until May 1, 2019, a whole month after Plaintiff's interview, close to two months after the NCD was issued, and three weeks after Smith had an official notice meeting about the Complaint and had spoken to a number of witnesses involved in the Investigation.

124.    During his interview, Smith's summary of events contradicted a number of witnesses, particularly with respect to his and Plaintiff's respective levels of intoxication and awareness on the night of the Assault.

125.    In his interview, Smith accused Plaintiff of being the aggressor on the night of the Assault.

126.    Notably, however, when Smith discussed his actions after the Assault, he conveniently did not tell the Investigators that he had sent a text to a friend wherein he stated that he was "a piece of shit for this one" and admitted that he hooked up with Plaintiff and was "99 percent sure she (meaning Plaintiff) was completely gone (meaning incapacitated)."

127.    The text message was eventually submitted to the Investigators by another witness, "Witness M" who was the friend Smith sent the message to.

**Plaintiff is Forced to Attend the University Alongside her Assaulter**
**And Is Subjected to Further Harassment and Bullying By Smith and His Friends**

128.    Throughout the investigation, the NCD was in place which, in theory, prohibited Smith and Plaintiff from having any direct or indirect contact with one another.

129.    Despite the NCD, however, Plaintiff was forced to attend the University alongside Smith which made it increasingly more difficult to feel safe on her own college campus.

130.    Making matters worse, it quickly became evident that Smith, and those aligned with him, had little to no interest in complying with the mandates of the NCD.

131.    During the pendency of the investigation, Plaintiff was enrolled in and attended several classes alongside Smith's friends, many of which were also former friends and acquaintances of Plaintiff.

132.    It was clear to Plaintiff that these individuals no longer harbored any positive feelings towards her, and fully resented her for her Complaint against Smith.

133.    Smith's friends frequently tormented Plaintiff in the classroom with comments demeaning her character, calling her a liar, and accusing her of filing her Complaint against Smith, an African American man, because she was racist.

134.    Students would comment that Plaintiff was a racist who lied about being raped, and openly joked in front of Plaintiff and amongst themselves that people needed to "watch out" for Plaintiff "or you might get sued."

135.    In addition, Plaintiff was part of a cluster class which incorporated four disciplines/subject classes into one conglomerate course.

136.    As part of the cluster class, Plaintiff was required to work in a group setting with her fellow classmates in order to complete a rather large and complex assignment.

137.    Plaintiff's grade in the cluster class was predominantly, if not wholly, dependent on that group assignment.

138.    Unfortunately, the members of Plaintiff's cluster were, upon information and belief, friends of Smith. In addition, many other students who were not directly acquainted with Smith engaged in gossip spreading rumors about Plaintiff that were, upon information and belief, started by Smith and his friends.

139. In addition to making comments similar to those made by other students regarding Plaintiff "faking" being a rape victim, the students also taunted Plaintiff in class by physically poking and prodding at Plaintiff to get her attention only to again call her a liar and a racist for her complaint against Smith.

140. The stress and anxiety Plaintiff experienced as a result of the continued harassment she experienced from peers in retaliation for her Complaint felt insurmountable.

141. Plaintiff felt targeted, isolated, and deeply depressed; she began missing classes out of fear of experiencing further torment, and lost so much sleep and weight that she was forced to undergo emergency hernia surgery.

142. The more Plaintiff tried to avoid the harassment and protect herself, the worse it became.

143. After Plaintiff stopped going to classes in order to attend therapy sessions, Smith's friends created a social media, specifically Snap Chat, group dedicated to following Plaintiff when she ventured onto campus and taking photos of her.

144. In response to her rapid weight loss and depression, rumors began circulating that Plaintiff had cancer. Though this should have been a cause for alarm and concern for civilized individuals, it only served as another means and reason to ridicule and target Plaintiff on campus.

145. Upon information and belief, the rumors were spread by Smith and his friends.

146. It was as though every time Plaintiff stepped outside of her personal living space at the University, she was put up for display to be torn down for Smith's and his friends' enjoyment.

147.    The harassment from fellow students was so open and notorious that other members of Plaintiff's class spoke out on Plaintiff's behalf, and asked Plaintiff's professor to step in and do something.

148.    Plaintiff also reported the continued harassment, which she felt was targeted towards her because of her Complaint, to the University hoping that Defendant OU would step in and help protect her.

149.    On the contrary, in response to Plaintiff's and Plaintiff's classmates' reports of ongoing harassment, the University blamed Plaintiff and put additional burdens on Plaintiff to account for and address the harassment.

150.    By way of example, after Plaintiff reported to her professor, Lori Marchese ("Marchese"), that the reason she had missed class was due to the ongoing rumors and gossip from peers, the trauma of her Assault, and the feeling that the classroom was no longer a safe environment, Marchese responded that she was not surprised that the students in class were acting "less than mature" but assured Plaintiff that "eventually you will get stronger and be able to deal with these scenarios."

151.    Upon information and belief, as the professor of the class, Marchese had the ability and authority to take corrective action against those who were tormenting Plaintiff in order to allow Plaintiff to continue attending the class.

152.    Despite this, Marchese apparently felt that the appropriate response to learning her student's classroom had become an unsafe environment was to tell Plaintiff not to worry because eventually she would be strong enough of a person to deal with it.

153.    It seemed that in Marchese's eyes, Plaintiff was just too naïve at that time to know how to properly deal with rape, retaliation, and sexual harassment.

154.    In addition, Marchese advised Plaintiff that moving forward, she believed it was better for Plaintiff to simply stop attending class. Marchese was sure to tell Plaintiff that the absences could be excused with a doctor's note but that Plaintiff would remain responsible for finding ways to teach herself all of the material she missed.

155.    Plaintiff also reported the ongoing harassment to the Investigators.

156.    Specifically, Plaintiff reported that her fellow students were harassing her and that she often left class in tears due to the trauma and ongoing retaliation she was facing as a result of her Complaint against Smith.

157.    Plaintiff's father also reported ongoing harassment of his daughter to Defendant OU's then Director and Title IX Coordinator, Kerri Griffin.

158.    In response, Plaintiff was told that there was "not much" the University could do.

159.    The University refused to look into the complaint, or talk to any students in Plaintiff's classes, unless and until Plaintiff specifically pinpointed each person and instance of harassment.

160.    However, the harassment was so pervasive, frequent, and conducted by so many students as a collective that it was nearly impossible for Plaintiff to do so.

161.    As a consequence, the Investigators and Ms. Griffin dismissed the matter and refused to look into it further.

162.    In essence, the University's response was to let Plaintiff know that it supported her efforts to fix the problem herself.

163. Indeed, the only measure the Investigators or Ms. Griffin took to address Plaintiff's and her father's complaints was to allow Plaintiff's teacher to advise Plaintiff to stop attending classes.

164. As a result of the University's utter lack of response to the reported ongoing harassment faced by Plaintiff after her Complaint, the harassment continued.

165. While Plaintiff was left to shutter herself away and withdraw from her educational environment, her tormentors were permitted to go about and continue their campaign against her without consequence.

**Defendant OU Finds Smith Responsible for Sexually Assaulting Plaintiff**

166. Following the conclusion of the investigation, the Investigators released an investigative report detailing their investigation and the information gathered from interviews and documents (the "Report").

167. As evident from the Report, Defendant OU had amassed significant evidence corroborating Plaintiff's Complaint and supporting Smith's responsibility for the Assault.

168. Such evidence included, but was not limited to:

    a.    Plaintiff's first-hand testimony regarding what she experienced before, during, and after the Assault;

    b.    Witness testimony regarding Plaintiff's obviously high level of intoxication, incoherency, and incapacitation on the night of the Assault;

    c.    Photographic and video evidence of Plaintiff's high level of intoxication, incoherency, and incapacitation on the night of the Assault;

    d.    Witness testimony indicating that Respondent was not as intoxicated as Plaintiff on the night of the Assault;

      e.    Text messages from Smith indicating he knew he had "fucked up", was a "piece of shit" and admitting that he had "hooked up" with Plaintiff and was "99 percent sure [Plaintiff] was completely gone"; and

      f.    Witness testimony from Plaintiff's outreach witnesses regarding the Assault.

169.    Notably, the Report was devoid of any facts, allegations, or mere mention of the continued harassment Plaintiff experienced from Smith and fellow students after the Complaint was submitted.

170.    Following the Report, the University convened a Hearing Panel to adjudicate Plaintiff's Complaint and Smith's responsibility.

171.    The Hearing Panel consisted of Tackett and Bennett.

172.    Plaintiff noticed a marked difference in how she was treated during the hearing versus how Smith was treated.

173.    Indeed, even before the hearing, the Hearing Panel had showed obvious favor towards Smith in scheduling and refused to accommodate any of Plaintiff's scheduling conflicts which led to Plaintiff having to take off two days of work from her new internship to attend the hearing.

174.    Moreover, during the hearing, the Hearing Panel permitted Smith to, at several points in time, directly address and scream at Plaintiff.

175.    When the direct attacks on Plaintiff during the hearing became too much to bear, Plaintiff excused herself from the hearing to step outside but requested that her advisor and support person, "M.H.", remain in the hearing room so the hearing could continue.

176.     Plaintiff saw no problem with this as she had previously been advised that she was not required to be present for the hearing in order for it to move forward.

177.     Despite this, and in spite of Plaintiff's obvious distress, the Hearing Panel forced Plaintiff to return to the hearing and adamantly refused to continue with the hearing without her being physically present.

178.     On or about July 8, 2019, the Hearing Panel issued an outcome letter advising of the University's conclusions regarding Plaintiff's Complaint against Smith.

179.     Relying on the credible evidence, including witness testimony and the text message sent by Smith to Witness M, the Hearing Panel found Smith responsible for Sexual Misconduct – Non-Consensual Sexual Intercourse and Sexual Misconduct – Non-Consensual Sexual Contact under the Policy (the "Initial Determination")

180.     As a consequence, the Hearing Panel suggested permanent and immediate expulsion as the appropriate measure of discipline (the "Sanction").

181.     Part of the University's basis for the Initial Determination and Sanction was the text message Smith sent the morning following the Assault, where he indicated that he was "99 percent sure" that Plaintiff was incapacitated, or "gone", at the time he engaged in sexual intercourse with her.

182.     Plaintiff felt relieved that the University had seemingly considered all of the evidence and had come to the correct and just conclusion. Despite how difficult the experience had been, Plaintiff finally felt confident that making her Complaint to Defendant OU was the proper action to take and Smith would finally be held accountable for his actions.

**Defendant OU Breaks Its Own Policy to Allow Smith to Clear His Name**

183.    Pursuant to the Process Document, both Plaintiff and Smith were permitted five business days to appeal the Initial Determination and/or Sanction. If submitted, the appeal would be considered by Defendant OU's Vice President for Student Affairs, Pina.

184.    The Process Document included a finite and exhaustive list of bases for appeal.

185.    The bases for appeal were strictly limited to: (i) inappropriate sanction; (ii) procedural defect in the original hearing; and (iii) presence of new evidence that was not available at the time of the hearing.

186.    With respect to an appeal on the basis of a procedural defect, the appeal must demonstrate that a *procedural* defect occurred that was "substantial enough to change the outcome of the finding."

187.    With respect to an appeal on the basis of new evidence, the new evidence must be that which "was not available at the time of the original investigation."

188.    On or about July 15, 2019, Smith submitted an appeal of the Initial Determination and Sanction.

189.    In his appeal, Smith purported to base his appeal on a procedural defect in the original investigation and hearing.

190.    Although Smith alleged to have been filing his appeal based on a procedural defect, nowhere in Smith's appeal does he actually point to a procedural defect in the process afforded to him.

191.    Rather, Smith's appeal was dedicated entirely to his disagreement with the Hearing Panel's interpretation of the evidence submitted, namely the text message he sent regarding the Assault and his knowledge that Plaintiff was incapacitated.

192.    In essence, Smith's appeal was solely based on his disagreement with the fact that he had been found responsible for sexual assault and expelled as a result.

193.    At no point did Smith point to a legitimate procedural error in the Title IX process afforded to him so as to warrant a proper appeal of the Initial Determination.

194.    Nor did Smith attempt to introduce new evidence for Pina's consideration.

195.    Rather, Smith pointed to the evidence that had already been submitted and considered by the Hearing Panel, noted his disagreement with how the evidence was used and analyzed by the Hearing Panel, and stated he thought it was "unfair" to him.

196.    Smith's utter and obvious failure to submit an appeal on any one of the permissible bases should have been fatal to his appeal. However, in a damaging and utterly unfounded turn of events, Pina chose to forego the University's strict policies, and allowed Smith's appeal to go forward.

**Defendant OU Holds a Limited Re-Hearing**

197.    In response to Smith's appeal, Pina ordered that a re-hearing take place on the sole issue of Smith's knowledge of Plaintiff's incapacitation on the night of the Assault.

198.    Plaintiff was dumbfounded; the Hearing Panel had already fully analyzed the evidence, which significantly supported the fact that Smith was aware, or at a minimum should have been aware, that Plaintiff was nearly entirely incapacitated on the night of the Assault.

199.    Plaintiff could not understand how or why the University would ever entertain such a procedurally and substantively deficient appeal which amounted to nothing more than Smith expressing his displeasure with the Initial Determination.

200.    On or about September 6, 2019, Plaintiff participated in the limited re-hearing related to her Complaint. The limited re-hearing was before the same Hearing Panel.

201.    During the limited re-hearing, the Hearing Panel allowed Smith to elaborate on his actions the evening of the Assault. Smith artfully presented his side of the story and often times contradicted his earlier statements to investigators in order to match what witnesses had presented during their prior interviews and testimony.

202.    At no point in time did Smith present any new evidence to the Hearing Panel during the limited re-hearing.

**Plaintiff Continues to Experience Ongoing Harassment from Peers at the University**

203.    Following the limited re-hearing, Plaintiff continued to experience ongoing harassment from students at Defendant OU.

204.    The ongoing harassment was torture for Plaintiff; her grades suffered and she had virtually no will to continue with her life on campus.

205.    Any time Plaintiff managed to venture out on campus, she was continually met with fierce hostility; students would come up to Plaintiff in class and say, "aren't you that girl who was raped and is a total mess now?"

206.    In addition, when Plaintiff would attend class, she heard her fellow students remark that they did not want to work on assignments with her because "she is never in class after faking a rape."

207.    The students were not shy to make it known that Plaintiff was specifically being targeted based on her status as a rape victim.

208.    Plaintiff again complained to the University, and her father complained to Ms. Griffin, that there was ongoing harassment and retaliation occurring against Plaintiff at the University.

209.    In response, Ms. Griffin told Plaintiff's father that she spoke with Investigator Fausnight and would see what they could do to assist Plaintiff.

210.    Tellingly, however, neither Ms. Griffin nor Investigator Fausnight ever reached out to Plaintiff regarding the ongoing harassment and retaliation, or Plaintiff's father's complaint.

211.    Again, nothing came of Plaintiff's and her father's complaints of continued harassment and Plaintiff was left to fester in an ever increasingly hostile educational environment where her peers openly targeted her for being a victim of sexual assault.

**Despite the Overwhelming Evidence, Defendant OU Astonishingly Changes Its Mind About Smith's Guilt**

212.    Plaintiff was hopeful that after the limited re-hearing, which elicited the same facts and evidence as the initial hearing, the Hearing Panel would once again see-through Smith's desperate attempt to avoid responsibility for his actions, properly assess the evidence and render a just result.

213.    In contrast, on September 17, 2019, the Hearing Panel reversed its Initial Determination and found Smith not responsible for any policy violations (the "Final Determination").

214.    Specifically, the Hearing Panel, upon information and belief in fear of further complaints of unfairness from Smith and allowing Smith, the male respondent, the benefit of every

doubt, held instead that Smith could not have known that Plaintiff was incapacitated at the time of the Assault.

215.    In so doing, the Hearing Panel ignored the same credible evidence it once relied upon to find Smith responsible in the Initial Determination.

216.    In a feeble attempt to justify its unfathomable decision, the Hearing Panel opined that it was *possible* that Plaintiff had at some undetermined point (unknown to both the Hearing Panel, Smith, and Plaintiff) gone from incapacitated to merely very drunk, and therefore she could not have been Assaulted.

217.    As a result of the Final Determination, Smith was cleared of all wrong-doing and Policy violations, and his expulsion was nullified; Smith was permitted to continue attending the University without consequence.

218.    Notably, between Smith's filing of his appeal and the Final Determination, Smith had been arrested and criminally charged for raping Plaintiff.

219.    Plaintiff dutifully advised the University that the evidence against Smith was sufficient to bring criminal charges based on a higher standard of proof (beyond a reasonable doubt). This apparently did not factor into the Hearing Panel's deliberations, as the panel seemed determined to clear Smith's name.

**The University Refuses to Allow Plaintiff the Same Rights and Opportunities as Smith**

220.    Plaintiff felt crushed and demoralized at the University's stark change in its decision; she could not understand how all the evidence that supported a finding against Smith originally was allowed to be reviewed and then used to exonerate him at the University.

221. At the time Plaintiff learned of the Final Determination, she was advised of her appeal rights under the Process Document.

222. Based on the notification provided by the University, the limits on the appeal, particularly the limited bases for appeal, were the same as after the Initial Determination was rendered.

223. Plaintiff spoke with Tackett about her right to appeal and the potential basis for her appeal being, among other things, the arbitrary and nonsensical change in the Hearing Panel's assessment of the evidence.

224. Appallingly, Plaintiff was told that, without new evidence, the University would not entertain any appeal by her and would not, under any circumstances, be willing to review the evidence again.

225. Indeed, Plaintiff was told that she could not appeal the decision just because she did not like it. Curiously, that was *exactly* what Pina allowed Smith to do.

226. Despite Tackett's obvious attempts to dissuade Plaintiff from filing an appeal of the Final Determination, Plaintiff still submitted an appeal.

227. Plaintiff submitted her appeal on the basis of an inappropriate sanction, which included the basis that the Hearing Panel abused its authority in rendering its conclusions.

228. Here, there was ample evidence that the Hearing Panel had abused its authority including, but not limited to, the fact that it allowed Smith to submit an appeal merely because he was dissatisfied with the result and not on any legitimate basis, and relied upon conjecture and assumptions to find Plaintiff *may have* stopped being incapacitated and therefore could not have been raped.

229.     Despite the ample evidence, again Pina sided with Smith and denied Plaintiff's appeal. Notably, Pina did not elaborate on the reasons for denying Plaintiff's appeal but rather stated simply, "[a]fter reviewing your appeal and the record on the matter, I am upholding the finding of 'Not in Violation'…"

**Smith Returns to Campus and Makes Plaintiff's Life a Living Hell While the University Stands by and Watches**

230.     Following the reversal of the Initial Determination and Sanction, and the denial of Plaintiff's appeal, Plaintiff was forced to go back to the University alongside Smith.

231.     Indeed, the University even rescinded the NCD between Plaintiff and Smith.

232.     Plaintiff dreaded having to return to the University which had failed to protect her and which was now allowing Smith to roam freely without any limitation on his actions or protections for Plaintiff.

233.     Following the Final Determination, Plaintiff would consistently and routinely see Smith on campus, as though he was purposefully putting himself in Plaintiff's path. Every time Plaintiff saw Smith, her memories were triggered and she fell deeper and deeper into depression and an emotional spiral.

234.     Making matters worse, at the time Plaintiff returned to the University, Smith had already been indicted on criminal charges for her rape and was subject to a protective order requiring him to stay away from Plaintiff.

235.     Smith routinely violated the protective order to the point that both Plaintiff and the District Attorney spoke to the University to ask the University to step in and help protect Plaintiff. Again, the University did nothing.

236.    Smith's behavior escalated and, on at least one occasion, he brazenly walked right up to Plaintiff and Plaintiff's friends while out at a bar.

237.    After Plaintiff reported this incident to the District Attorney and the University, it was only the District Attorney who stepped in and requested a warrant for Smith's arrest on the basis that he violated his bond and the protective order.

238.    In light of Smith's violation of the protective order, he was arrested.

239.    Not only did Plaintiff have to contend with Smith's behavior, she also continued to experience harassment from Smith's friends, who continued to call her names, spread rumors, and openly tell her "even the school knows you're full of shit."

**Smith Pleads Guilty in Criminal Court to Plaintiff's Assault**

240.    On or about July 21, 2020, Smith pled guilty to a charge of Sexual Battery in violation of Ohio's criminal code Section 2907.03(A)(2) which, under Ohio law, is a felony in the third degree.

241.    Sexual Battery under Ohio's criminal code is defined as the engagement of sexual conduct with another when, as applicable here, "the offender *knows* that the other person's ability to appraise the nature of or control the other person's own conduct is substantially impaired," *See* R. C. 2907.03 (A)(2) (sexual battery) (emphasis added).

242.    As a result of his guilty plea, Smith is currently serving a three-year prison sentence.

**Plaintiff is Left in Shambles**

243.    As expected, Plaintiff suffered emotionally following the Assault.

244.    However, Plaintiff did not, and arguably could not, have expected how much the University's gross mishandling of her Complaint would exacerbate and compound upon her already frail emotional and physical well-being.

245.    As a result of Defendant OU's actions and inactions, Plaintiff was forced to suffer ongoing bullying, harassment, and retaliation by her peers who lashed out at her for her Complaint. The emotional toll this harassment took on Plaintiff was only made worse by the University's lackadaisical and borderline victim blaming response to Plaintiff's cries for help.

246.    However, things hit an all time low for Plaintiff after the University, without sufficient basis, overturned its own decision and cleared Smith of all charges, even when the University knew he had admitted to knowing Plaintiff was incapacitated during the Assault and knew there was sufficient evidence to proceed with criminal charges under a higher burden of proof.

247.    Plaintiff's emotional well-being spiraled out of control. Though she sought help with mental health physicians, she still fell into a deep depression which, to date, she still suffers from.

248.    As a result of the deterioration of her mental health, Plaintiff suffered physically and fell behind in her school work, resulting in her delayed graduation and a delayed start to her job prospects and career.

**CAUSES OF ACTION**
**AS AND FOR A FIRST CAUSE OF ACTION**
*(Violation of Title IX of the Education Amendments of 1972: Deliberate Indifference to*
*Plaintiff's Specific Complaints)*
*(As Against Defendant OU)*

249.    Plaintiff repeats and re-alleges each and every allegation above with the same force and effect as if fully set forth herein.

250.    Title IX of the Education Amendments of 1972 provides, in relevant part, that: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

251.    Title IX of the Education Amendments of 1972 applies to all public and private educational institutions that receive federal funding.

252.    Defendant OU receives federal funding.

253.    Title IX is enforceable through a private right of action.

254.    Both the Department of Education and the Department of Justice have promulgated regulations under Title IX that require a school to "adopt and publish grievance procedures providing for the *prompt and equitable resolution* of student… complaints alleging any action which would be prohibited by" Title IX or regulations thereunder. 34 C.F.R. § 106.8(b) (Dep't of Education); 28 C.F.R. § 54.135(b) (Dep't of Justice) (emphasis added).

255.    The failure of a university to promptly and adequately address complaints of sexual assault and/or harassment amounts to "deliberate indifference" for which Defendant OU may be held liable under Title IX.

256. Defendant OU acted with deliberate indifference to known acts of sexual assault and harassment when it, among other things, (i) failed to investigate Plaintiff's complaints of continued harassment from peers and her assaulter following her Complaint; (ii) further victimized Plaintiff in response to Plaintiff's complaints of ongoing harassment from peers; (iii) permitted Smith to submit a deficient appeal; (iv) failed to properly assess and/or ignored the evidence against Smith in favor of reversing the Initial Determination against him; (v) rescinded the NCD thereby leaving Plaintiff vulnerable to further harassment which Plaintiff in fact experienced; and (vi) failed to properly protect Plaintiff after notification that Smith was harassing Plaintiff in violation of a lawful protective order.

257. In addition, Defendant OU and Defendant OU's agents, including but not limited to the individually named defendants herein, the Investigators, and Ms. Griffin intentionally and/or willfully and/or deliberately refused to investigate Plaintiff and Plaintiff's father's continued complaint of ongoing post-Complaint harassment leading to an ever increasingly worse hostile educational environment which Plaintiff was subjected because of her status as a rape victim.

258. Defendant OU's actions constitute deliberate indifference as its inadequate investigation and remedies to Plaintiff's complaints were clearly unreasonable in light of the known circumstances, including the gravity of the allegations and the severity and pervasiveness of the alleged misconduct.

259. Defendant OU's failure to promptly and adequately respond to Plaintiff's complaint of sexual assault against Smith and Plaintiff's and Plaintiff's father's complaints of ongoing harassment both during and after the investigation subjected Plaintiff to further harassment and retaliation as well as a sexually hostile environment, which was so severe, pervasive, and

objectively offensive that it effectively denied Plaintiff access to educational opportunities at Defendant OU.

260.    As a direct and proximate result of Defendant OU's deliberate indifference to Plaintiff's complaints of sexual misconduct in violation of Title IX, Plaintiff was subjected to a hostile educational environment while attempting to pursue her education on Defendant OU's campus.

261.    As a direct and proximate result of Defendant OU's deliberate indifference to Plaintiff's complaints of sexual misconduct in violation of Title IX, Plaintiff was deprived of her access to educational opportunities as she was, *inter alia*, unable to adequately focus on her studies in light of the sexual assault and continuing sexual harassment that the University refused to remedy. As a result, Plaintiff's grades were negatively impacted, and Plaintiff's graduation was significantly delayed.

262.    As a direct and proximate result of Defendant OU's deliberate indifference to Plaintiff's complaints of sexual misconduct in violation of Title IX, Plaintiff has suffered and continues to suffer significant, severe, and ongoing emotional distress and mental anguish.

263.    In light of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, past and future economic losses, loss of educational and career opportunities, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

**AS AND FOR A SECOND CAUSE OF ACTION**
*(Violation of Title IX of the Education Amendments of 1972: Sexually Hostile Environment)*
*(As Against Defendant OU)*

264.    Plaintiff repeats and re-alleges each and every allegation above with the same force and effect as if fully set forth herein.

265.    Title IX of the Education Amendments of 1972 provides, in relevant part, that: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

266.    Title IX prohibits federally-funded institutions from engaging in discrimination on the basis of sex.

267.    Sexual harassment is included within the meaning of "discrimination" under Title IX.

268.    Sexual harassment of a student creates a hostile environment if the conduct is sufficiently severe that it denies or limits a student's ability to participate in or benefit from educational programs.

269.    A single instance of rape is sufficiently severe to create a hostile education environment.

270.    Title IX of the Education Amendments of 1972 applies to all public and private educational institutions that receive federal funding.

271.    Defendant OU receives federal funding.

272.    Title IX is enforceable through a private right of action.

273.     Both the Department of Education and the Department of Justice have promulgated regulations under Title IX that require a school to "adopt and publish grievance procedures providing for the *prompt and equitable resolution* of student… complaints alleging any action which would be prohibited by" Title IX or regulations thereunder. 34 C.F.R. § 106.8(b) (Dep't of Education); 28 C.F.R. § 54.135(b) (Dep't of Justice) (emphasis added).

274.     The failure of a university to promptly and adequately address complaints of sexual assault and/or harassment amounts to "deliberate indifference" for which Defendant OU may be held liable under Title IX.

275.     Defendant OU acted with deliberate indifference to known acts of sexual assault and harassment when it, among other things, (i) failed to investigate Plaintiff's complaints of continued harassment from peers and her assaulter following her Complaint; (ii) further victimized Plaintiff in response to Plaintiff's complaints of ongoing harassment from peers; (iii) permitted Smith to submit a deficient appeal; (iv) failed to properly assess and/or ignored the evidence against Smith in favor of reversing the Initial Determination against him; (v) rescinded the NCD thereby leaving Plaintiff vulnerable to further harassment which Plaintiff in fact experienced; and (vi) failed to properly protect Plaintiff after notification that Smith was harassing Plaintiff in violation of a lawful protective order.

276.     In addition, Defendant OU and Defendant OU's agents, including but not limited to the individually named defendants herein, the Investigators, and Ms. Griffin intentionally and/or willfully and/or deliberately refused to investigate Plaintiff and Plaintiff's father's continued complaint of ongoing post-Complaint harassment leading to an ever increasingly worse hostile educational environment which Plaintiff was subjected because of her status as a rape victim.

277.    Defendant OU's failure to promptly and adequately respond to Plaintiff's complaint of sexual assault against Smith and Plaintiff's and Plaintiff's father's complaints of ongoing harassment both during and after the investigation subjected Plaintiff to further harassment and retaliation as well as a sexually hostile environment, which was so severe, pervasive, and objectively offensive that it effectively denied Plaintiff access to educational opportunities at Defendant OU.

278.    As a direct and proximate result of Defendant OU's actions and/or inactions, Plaintiff was subjected to a hostile educational environment while attempting to pursue her education on Defendant OU's campus.

279.    As a direct and proximate result of Defendant OU's actions and/or inactions in response to Plaintiff's complaints of sexual misconduct, Plaintiff was deprived of her access to educational opportunities as she was, *inter alia*, unable to adequately focus on her studies in light of the sexual assault and continuing sexual harassment that the University refused to remedy. As a result, Plaintiff's grades were negatively impacted, and Plaintiff's graduation was significantly delayed.

280.    As a direct and proximate result of Defendant OU's actions and/or inactions in response to Plaintiff's complaints of sexual misconduct, Plaintiff has suffered and continues to suffer significant, severe, and ongoing emotional distress and mental anguish.

281.    In light of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, past and future economic losses, loss of educational and career opportunities, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## AS AND FOR A THIRD CAUSE OF ACTION

*(Violation of the Due Process Clause of the 14th Amendment of the United States Constitution pursuant to 42 U.S.C. § 1983: Procedural Due Process)*
*(As Against all Defendants)*

282.     Plaintiff repeats and re-alleges each and every allegation above with the same force and effect as if fully set forth herein.

283.     The Fourteenth Amendment to the United States Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law."

284.     In this case, Defendants are state actors subject to the Fourteenth Amendment.

285.     Defendants had an independent obligation to Plaintiff to afford Plaintiff proper notice and an opportunity to be heard as it related to her complaints of sexual assault and sexual misconduct against Smith and her peers.

286.     Section 1983 of Title 42 of the U.S. Code provides in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .

287.     A person has a protected liberty interest in her good name, reputation, honor, and integrity, of which she cannot be deprived without due process.

288.     A person has a protected property interest in pursuing her education, as well as in future educational and employment opportunities and occupational liberty, of which she cannot be deprived without due process.

289.     It is well established that Fourteenth Amendment due process protections are required in higher education disciplinary proceedings.

290.    Defendant OU and the individual Defendants Tackett, Bennett, and Pina, as agents of Defendant OU, had a duty to provide Ohio's students equal protection and due process of law by and through any and all policies and procedures set forth by the University.

291.    Plaintiff was entitled to a meaningful opportunity to be heard and process commensurate with the seriousness of the allegations she lodged against Smith and her peers.

292.    As set forth herein and above, Defendants flagrantly violated Plaintiff's clearly established rights under the Due Process Clause of the Fourteenth Amendment by, among other things, (i) disallowing Plaintiff the opportunity to properly appeal the Final Determination under the same basis and standards Smith was permitted to appeal the Initial Determination and (ii) depriving Plaintiff of her right to report and be heard related to her complaints of ongoing sexual harassment and retaliation following submission of her Complaint against Smith.

293.    Defendants' procedures were defective and violated due process.

294.    As a result, Defendants failed to provide Plaintiff with the basic due process protections that they are required to provide students involved in student disciplinary proceeding.

295.    Defendants, as well as other agents, representatives, and employees of Defendant OU, were acting under color of state law when they showed intentional, outrageous, and reckless disregard for Plaintiff's constitutional rights.

296.    Defendants all agreed to, approved, and ratified this unconstitutional conduct as described above.

297.    As a result of these due process violations, Plaintiff suffered, and continues to suffer, ongoing harm, including, but not limited to, damages to her reputation, loss of employment

and educational opportunities, severe emotional trauma, and other economic and non-economic damages.

298.  As a result of the foregoing, Plaintiff seeks damages against the individual defendants in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, past and future economic losses, loss of educational and career opportunities, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

299.  Plaintiff further seeks declaratory relief declaring Defendant OU's process under the Policy and Process Document unconstitutional, plus an injunction enjoining violations of the Fourteenth Amendment in the process of investigating and adjudicating sexual assault and/or sexual misconduct complaints.

## AS AND FOR A FOURTH CAUSE OF ACTION
*(Violation of the Due Process Clause of the 14th Amendment of the United States Constitution pursuant to 42 U.S.C. § 1983: Substantive Due Process)*
*(As Against all Defendants)*

300.  Plaintiff repeats and re-alleges each and every allegation above with the same force and effect as if fully set forth herein.

301.  The Fourteenth Amendment to the United States Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law."

302.  In this case, Defendants are state actors subject to the Fourteenth Amendment.

303.  Section 1983 of Title 42 of the U.S. Code provides in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the

Constitution and laws, shall be liable to the party injured in an action
at law, suit in equity, or other proper proceeding for redress. . . .

304.     "The right to bodily integrity, including the right to be free from sexual assault, is

protected by the substantive Due Process Clause" of the Fourteenth Amendment to the United

States Constitution. *See Lipian v. Univ. of Michigan*, 453 F.Supp.3d 937, 965 (S.D. Mich 2020)

(citing *Doe v. Claiborne Cty., Tenn. By & Through Claiborne Cty. Bd. of Educ.*, 103 F.3d 495,

506-07 (6th Cir. 1996)).

305.     A school may be held liable for instituting and/or maintaining and/or condoning a

policy that causes a student to be subject to sexual assault. *See Id*.

306.     As set forth herein and above, Defendants were aware, or at a minimum reasonably

should have been aware, that sexual assault had become a pervasive issue on its campus in light

of, among other things, (i) student outcry; (ii) local and national media attention highlighting

Defendant OU's sexual assault issue and campus rape culture; and (iii) the mass amounts of reports

of sexual assault perpetrated against Defendant OU's female students.

307.     In light of this knowledge, Defendants maintained and/or condoned and/or

implemented policies, procedures, and practices that were insufficient to adequately and promptly

address sexual misconduct on Defendant OU's campus and which left victims of sexual

misconduct vulnerable on Defendant OU's campus.

308.     Through these policies, procedures, and practices, Defendants created and/or

condoned and/or were deliberately indifferent to a culture of sexual hostility and violence against

women by, among other things, (i) failing to adequately investigate complaints of sexual assault

and sexual misconduct from female students; (ii) permitting male students, including and

especially fraternity members, to openly harass and use sexually explicit language towards the

University's female students without consequence; (iii) permitting male respondents the benefit of every doubt and allowing male respondents in sexual misconduct disciplinary proceedings to disregard the rules and procedures meant to afford equal protection to complainants and respondents; permitting female students to be subjected to ongoing retaliation and harassment after submitting reports of sexual misconduct; and (iv) blaming female victims of sexual misconduct for ongoing harassment from male peers.

309. Defendants were aware of the deficiencies in its policies, procedures, and practices and intentionally and/or willfully and/or deliberately failed to remedy such policies, procedures, and practices leading to a sexually hostile campus rape culture at Defendant OU.

310. Defendant OU's sexually hostile policies and practices were a proximate cause of Plaintiff's subjection to months of sexual harassment in the form of (i) a sexual assault by one of Defendant OU's male students; (ii) a hostile educational environment; and (iii) ongoing and prolonged harassment by forcing Plaintiff to interact with her assailant and his peers in her daily academic life leading to further harassment and retaliation which Defendant OU refused to investigate or remedy.

311. Defendants' procedures were defective and violated due process.

312. As a result, Defendants failed to provide Plaintiff with the basic due process protections that they are required to provide students involved in student disciplinary proceeding.

313. Defendants, as well as other agents, representatives, and employees of Defendant OU, were acting under color of state law when they showed intentional, outrageous, and reckless disregard for Plaintiff's constitutional rights.

314. Defendants all agreed to, approved, and ratified this unconstitutional conduct as described above.

315. As a result of these due process violations, Plaintiff suffered, and continues to suffer, ongoing harm, including, but not limited to, damages to her reputation, loss of employment and educational opportunities, severe emotional trauma, and other economic and non-economic damages.

316. As a result of the foregoing, Plaintiff seeks damages against the individual defendants in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, past and future economic losses, loss of educational and career opportunities, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

317. Plaintiff further seeks declaratory relief declaring Defendant OU's process under the Policy and Process Document unconstitutional, plus an injunction enjoining violations of the Fourteenth Amendment in the process of investigating and adjudicating sexual assault and/or sexual misconduct complaints.

### AS AND FOR A FIFTH CAUSE OF ACTION
*(Violation of the Equal Protection Clause of the 14th Amendment to the United States
Constitution pursuant to 42 U.S.C. § 1983: Gender Discrimination)
(As Against all Defendants)*

318. Plaintiff repeats and re-alleges each and every allegation above with the same force and effect as if fully set forth herein.

319. Plaintiff is a female and is, therefore, a member of a protected class.

320.    The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution mandates that "[n]o state shall… deny any person within its jurisdiction the equal protection of the law."

321.    The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution is enforceable through 42 U.S.C. § 1983, which provides, in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress…

322.    As set forth herein and above, Defendants subjected Plaintiff, the female complainant, to differential treatment vis-à-vis Smith, the male respondent, and treated Plaintiff less well than Smith on the basis of Plaintiff's gender by, among other things, (i) subjecting Plaintiff to a sexual assault and sexual harassment through their policies condoning and/or endorsing a campus "rape culture"; (ii) failing to provide Plaintiff equal process and appeal rights as compared to her male assailant, Smith; (iii) permitting Smith to further harass Plaintiff on campus without consequence; and (iv) subjecting Plaintiff to a hostile education environment.

323.    Defendants, as well as other agents, representatives, and employees of Defendant OU, were acting under color of state law when they showed intentional, outrageous, and reckless disregard for Plaintiff's constitutional rights.

324.    Defendants all agreed to, approved, and ratified this unconstitutional conduct as described above.

325.    As a result of these constitutional violations, Plaintiff suffered, and continues to suffer, ongoing harm, including, but not limited to, damages to her reputation, loss of employment and educational opportunities, severe emotional trauma, and other economic and non-economic damages.

326.    As a result of the foregoing, Plaintiff seeks damages against the individual defendants in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, past and future economic losses, loss of educational and career opportunities, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

327.    Plaintiff further seeks declaratory relief declaring Defendant OU's process under the Policy and Process Document unconstitutional, plus an injunction enjoining violations of the Fourteenth Amendment in the process of investigating and adjudicating sexual assault and/or sexual misconduct complaints.

## DEMAND FOR A JURY TRIAL

328.    Pursuant to FRCP 38(b), Plaintiff hereby demands a trial by jury on all claims.

## PRAYER FOR RELIEF

**WHEREFORE,** for the foregoing reasons, Plaintiff seeks a judgment against Defendants as follows:

(i)    An Order enjoining Defendants, along with their agents, employees, and those acting in concert therewith, from unlawful discrimination on the basis of sex, including the failure to address, prevent and/or remedy sexual harassment;

(ii)    An Order enjoining Defendants, along with their agents, employees, and those acting in concert therewith, from retaliating against Plaintiff;

(iii)    On the first cause of action against Defendant OU for violation of Title IX of the Education Amendments of 1972: deliberate indifference to Plaintiff's complaints of sexual misconduct, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, reimbursement of and prepayment for all of Plaintiff's tuition or related expenses, payment of Plaintiff's expenses incurred as a consequence of the Assault of Defendant OU's response thereto, damages to physical well-being, emotional and psychological damages, past and future economic losses, loss of educational and career opportunities, together with prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(iv)    On the second cause of action against Defendant OU for violation of Title IX of the Education Amendments of 1972: hostile environment, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, reimbursement of and prepayment for all of Plaintiff's tuition or related expenses, payment of Plaintiff's expenses incurred as a consequence of the Assault of Defendant OU's response thereto, damages to physical well-being, emotional and psychological damages, past and future economic losses, loss of educational and career opportunities, together with prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(v)    On the third cause of action against the individual defendants Tackett, Bennett, and Pina for violation to the Fourteenth Amendment of the United States Constitution: procedural due process, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, reimbursement of and prepayment for all of Plaintiff's tuition or related expenses, payment of Plaintiff's expenses incurred as a consequence of the Assault of Defendants' response thereto, damages to physical well-being, emotional and psychological damages, past and future economic losses, loss of educational and career opportunities, together with prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(vi)    On the third cause of action against all Defendants in their official capacities for violation to the Fourteenth Amendment of the United States Constitution: procedural due process, a declaratory judgment that declaring the Defendants' actions and Defendant OU's process under the Policy and Process Document unconstitutional, plus an injunction enjoining violations of the Fourteenth Amendment in the process of investigating and adjudicating sexual assault and/or sexual misconduct complaints;

(vii)    On the fourth cause of action against the individual defendants Tackett, Bennett, and Pina for violation to the Fourteenth Amendment of the United States Constitution: substantive due process, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, reimbursement

of and prepayment for all of Plaintiff's tuition or related expenses, payment of Plaintiff's expenses incurred as a consequence of the Assault of Defendants' response thereto, damages to physical well-being, emotional and psychological damages, past and future economic losses, loss of educational and career opportunities, together with prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(viii)    On the fourth cause of action against all Defendants in their official capacities for violation to the Fourteenth Amendment of the United States Constitution: substantive due process, a declaratory judgment that declaring the Defendants' actions and Defendant OU's process under the Policy and Process Document unconstitutional, plus an injunction enjoining violations of the Fourteenth Amendment in the process of investigating and adjudicating sexual assault and/or sexual misconduct complaints;

(ix)    On the fifth cause of action against the individual defendants Tackett, Bennett, and Pina for violation to the Fourteenth Amendment of the United States Constitution: equal protection, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, reimbursement of and prepayment for all of Plaintiff's tuition or related expenses, payment of Plaintiff's expenses incurred as a consequence of the Assault of Defendants' response thereto, damages to physical well-being, emotional and psychological damages, past and future economic losses, loss of educational and career opportunities, together with prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(x)    On the fifth cause of action against all Defendants in their official capacities for violation to the Fourteenth Amendment of the United States Constitution: equal protection, a declaratory judgment that declaring the Defendants' actions and Defendant OU's process under the Policy and Process Document unconstitutional, plus an injunction enjoining violations of the Fourteenth Amendment in the process of investigating and adjudicating sexual assault and/or sexual misconduct complaints;

(xi)    Injunctive relief requiring Defendants OU, Tackett, Bennett, and Pina to redress its violations of Title IX, including, but not limited to: (1) instituting, with the assistance of outside experts, and enforcing a comprehensive sexual misconduct policy; (2) distributing written policies to all students describing prohibited activities and conduct and the consequences for violations; (3) providing for annual, independent review by outside reviewers of Defendant OU's compliance with sexual harassment policies and Title IX guidance; and (4) requiring Tackett, Bennett, and Pina to undergo Title IX training.

(xii)    Punitive and/or exemplary damages against Defendants;

(xiii)   Statutory pre- and post-judgment interest on all sums awarded;

(xiv)   An award of costs and attorneys' fees; and

(xv)    Any other relief the Court finds just and proper.

**Dated: May 12, 2021**

**THE BAKER LAW GROUP**

**By:** */s/ Andrew Baker*
         Andrew Baker, Esq.

         **107 S. High Street, Suite 400**
         **Columbus, Ohio 43215**
         **Tel: 614-228-71882**
         **Andrew.baker@bakerlawgroup.net**

**-and-**

**NESENOFF & MILTENBERG, LLP**

**By:***/s/ Andrew Miltenberg*
         **Andrew T. Miltenberg, Esq.**
         *(admitted pro hac vice)*
         **Stuart Bernstein, Esq.**
         *(admitted pro hac vice)*
         **Gabrielle M. Vinci, Esq.**
         *(admitted pro hac vice)*

         **363 Seventh Avenue, Fifth Floor**
         **New York, New York 10001**
         **Tel: 212-736-4500**
         **amiltenberg@nmllplaw.com**
         **gvinci@nmllplaw.com**

         ***Attorneys for Plaintiff Jane Doe***